

ENTERED
03/11/2021

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| **IMPERIAL PETROLEUM RECOVERY** | § | **CASE NO: 13-30466** |
| **CORPORATION,** | § | |
| Debtor. | § | **CHAPTER 7** |
| | § | |
| **DON B. CARMICHAEL**, *et al*, | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 14-3375** |
| | § | |
| **THOMAS BALKE**, *et al*, | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION</u>

Over three years ago, Plaintiffs—Don Carmichael, KK & PK Family LP, Barry Winston, and Gary Emmott—won a Judgment on their automatic stay violation claim. (*See* ECF No. 275). That Judgment directed Thomas Balke, Basic Equipment, and Ultratec LLC (the Defendants) to (i) turnover certain property to Plaintiffs, and (ii) pay damages under 11 U.S.C. § 362(k). Defendants contend this Judgment is erroneous. Central to Defendants' contention is their allegation that the Judgment directs the turnover of property that never existed. Defendants also take issue with the amount of damages awarded in the Judgment, which Defendants contend is unsupported by the evidence adduced at trial. Plaintiffs believe the Judgment is correct.

The Judgment was based on manifest errors of fact. These errors led to entry of a Judgment directing Defendants to turnover property that did not exist or that was already returned. The Judgment also awarded damages based on erroneous findings of fact. Defendants are entitled to partial relief from the Judgment.

## BACKGROUND

This adversary proceeding began over six years ago.  Since then, the parties have spent more than 100 hours in court and filed tens of thousands of pages of pleadings, motions, and exhibits.  Yet the questions now presented are simple: (1) did Defendants turnover all of the property as required by the Judgment; and (2) how much did Defendants' breach of the Judgment damage the Plaintiffs?

### *Procedural History*

In 2014, Plaintiffs instituted this adversary proceeding, claiming Defendants violated the automatic stay with respect to certain tangible and intangible property that once belonged to Imperial Petroleum Recovery Corporation's bankruptcy estate.[1]  This adversary proceeding was assigned to Judge Jeff Bohm until his retirement in August 2019.  Before he retired, Judge Bohm issued findings of fact and conclusions of law and a Judgment in favor of Plaintiffs.  (*See* ECF Nos. 242, 275).[2]  He also dismissed Defendants' Rule 59 Motion (*See* ECF Nos. 282, 286).  Defendants appealed from Judge Bohm's findings of fact and conclusions of law, the corresponding Judgment, several evidentiary rulings, and the dismissal of the Rule 59 Motion.  (ECF No. 305).  A procedural morass ensued.  (*See* ECF Nos. 289, 292, 305, 310, 320, 477, 596).  Eventually, Defendants' Rule 59 Motion made its way back to Bankruptcy Court when the District Court directed this Court to consider Defendants' original Rule 59 Motion on its merits.  (ECF No. 596 at 13–14).

---

[1] An involuntary chapter 7 petition was filed against Imperial in January 2013.  (ECF No. 242 at 4).  On July 15, 2014, the Trustee of Imperial's bankruptcy estate executed an "Assignment Agreement" under which Plaintiffs succeeded to ownership of substantially all the estate's assets.  (ECF No. 242 at 18–19).

[2] Judge Bohm's Findings of Fact and Conclusions of Law contain an extensive background of this adversary proceeding, the parties' dispute, and the facts underlying Defendants' Rule 59 Motion.  (*See generally* ECF No. 242).  Judge Bohm issued his Findings of Fact and Conclusions of Law after a multi-day, multi-witness trial.

### *The Rule 59 Dispute*

Defendants contend that the Judgment is based on erroneous findings of fact. These findings pertain to the existence of an "MST 1000 unit," this MST 1000's value, the value of a different MST 1000 unit, and the ownership of intangible property that Plaintiffs claim was subject to the automatic stay.[3] (*See* ECF No. 282 at 2–3).

<u>The MST Units</u>

The "MST 1000 units," on which this dispute centers, were developed by Imperial. (ECF No. 242 at 3, 17). The "MST" in "MST 1000" stands for "microwave separation technology." (ECF No. 242 at 3 (internal quotation marks omitted)). This "microwave separation technology" was used to "remediate and recover oil that resides in emulsions" (*i.e.,* separating oil from mud). (ECF No. 242 at 3 (internal quotation marks omitted)). This remediation and recovery of oil was accomplished using Imperial's MST units, which Imperial intended to sell to petroleum producers. (ECF No. 242 at 3). The functional purpose of these MST units bears little on the parties' dispute.

Instead, the parties' concerns center on Defendants' possession of the MST units and their tangible components. In 2011, before Imperial's bankruptcy, Imperial and Thomas Balke, as agent for Basic Equipment, entered a Memorandum of Understanding (the "MOU"). (ECF No. 242 at 13). Under the MOU, Basic agreed to "refurbish two MST 1000 units." (ECF No. 242 at 13). Refurbishing the MST 1000 units required Imperial to give Basic access to the technology and equipment necessary to complete the refurbishment. (ECF No. 242 at 13–14).

---

[3] At the outset of this Rule 59 dispute, Defendants argued that they were free to use patents formerly held by Imperial. (ECF No. 282 at 17–20). This right, Defendants asserted, meant that the Court erred in finding that Defendants had violated the stay by filing a provisional patent application based in part on an Imperial patent. (ECF No. 282 at 20). During the five days they were afforded to litigate their Rule 59 Motion, Defendants offered no evidence demonstrating that the prior finding regarding Imperial's patents was erroneous.

At the time the MOU was executed, Imperial "had already delivered one of these [MST 1000] units" to Basic, along with other spare MST parts.  (ECF No. 242 at 15–16).  Sometime later in 2012, Imperial delivered a second "MST 1000 unit" to Basic's storage yard.  (ECF No. 242 at 16).  This second unit (the "Brazil Unit") was delivered to Basic after a Brazilian petroleum company finished using the unit for its operations.  (ECF No. 242 at 16).  The refurbishment of one of these units was completed by September 2012.  (ECF No. 242 at 16).

In 2014, after Imperial entered bankruptcy, the Trustee assigned substantially all of Imperial's tangible and intangible property, as well as Imperial's contractual rights under the MOU and the estate's causes of action, to Plaintiffs.  (ECF No. 242 at 18).  In exchange, Plaintiffs partially released any claims they held against the estate.  (ECF No. 242 at 18).  Imperial's property that was assigned to Plaintiffs included: "[a]ll equipment and all other personal and fixture property . . . *including the MST 1000 unit, MST shipping container*, spare skid, spare parts, generator, 18 Wheeler Trailer, and HP laptop computer . . . ."  (ECF Nos. 242 at 18; 651-9 at 3 (emphasis added)).

When Plaintiffs took possession of the assigned property, they allege that "Plaintiffs discovered Defendants had failed to deliver all of the equipment in their possession."  (ECF No. 242 at 20).  Instead, "[t]he only property [Defendants] actually delivered were . . . two skids; one equipment trailer; one connex; one chiller; one transmitter; one waveguide; and one gutted and dismantled MST 1000 unit."  (ECF No. 242 at 21).  Defendants were found to have not delivered "the other MST 1000 unit . . . a microwave transmitter, an x-shaped waveguide, a tuner tubing section, a stand for a centrifuge, and two applicators."  (ECF No. 242 at 21).  The impetus for Defendants' purported retention of Plaintiffs' property was Defendants' desire—specifically, Mr. Balke and Ultratec—to compete with Imperial and acquire Imperial's proprietary information and

equipment for Defendants' own benefit.  (ECF No. 242 at 12, 28).  Plaintiffs' stay violation claim was based, in part, on Defendants' retention of the property, as well as the alleged gutting and dismantling of the returned Brazil MST 1000 unit.  (ECF No. 242 at 28).

By their Rule 59 Motion, Defendants' seek vacation of a portion of the Judgment requiring Defendants to turnover "all assets that the Chapter 7 Trustee conveyed to the Plaintiffs."  (ECF No. 282 at 21 (internal quotation marks omitted)).  Defendants base their request on the "manifest error of fact" that Imperial "had two fully functional . . . MST 1000 units."  (ECF No. 282 at 8). Defendants contend that, based on this error, the Judgment directs turnover of property that "does not exist."  (ECF No. 282 at 9).

According to Defendants, this "manifest error of fact" arose from the "incorrect assumption that the Brazil Unit was an MST 1000 unit."  Instead, Defendants contend the Brazil Unit was an "MST 150" that did not have "the proprietary MST applicator."  (ECF No. 282 at 10).  Defendants also contend that it was the Brazil Unit (not a separate MST 1000 unit) that was cannibalized at the direction of Imperial's CEO Alan Springer.  (ECF No. 282 at 10).  Defendants also assert that the parts cannibalized from the Brazil Unit were used to refurbish the MST 1000 unit listed in Imperial's schedules.  (ECF No. 282 at 10).  Defendants suggest that these facts demonstrate an error was made when the "MST Shipping Container" identified on Imperial's schedule was found to be a second operational MST 1000 unit.  (ECF No. 282 at 10–11; *see also* ECF No. 242 at 66 n.32).  Defendants argue the evidence demonstrates that the MST Shipping Container did not contain an operational MST 1000 unit, but instead held scrap parts from the MST 150—in reality, the remnants of the Brazil Unit.  (ECF No. 282 at 10–11).

Essentially, Defendants' asserted bases for relief are that (1) Defendants never possessed more than one of the MST 1000 units referenced in the MOU, and (2) that the MST unit Defendants

received from Brazil in 2012 was actually an MST 150 unit.  Because they turned over the single MST 1000 that existed and the leftover parts from the MST 150, Defendants claim they have complied with their turnover requirements to the maximum extent possible.

<u>Damages Awarded to Plaintiffs</u>

To establish the damages resulting from Defendants' stay violation, Plaintiffs relied on the opinion of Timothy Cole.  Mr. Cole estimated that the cost of building a new MST 1000 unit to replace the one retained by Defendants would be $1,073,656.00.  (ECF No. 242 at 31, 73, 77).  As for the "cannibalized" MST 1000 unit, Mr. Cole estimated its refurbishment would cost $884,156.00.  (ECF No. 242 at 32, 71).  Mr. Cole based these estimates on "a quote by TransAmerican Automation, Inc. to assemble an MST 1000 unit for use by Exxon in Chad, Africa [the 'Chad Unit']."  (ECF No. 242 at 30).

Based on Mr. Cole's estimates, Plaintiffs were awarded $1,957,812.00 in actual damages. (ECF No. 242 at 81).  In doing so, Defendants' contention that Plaintiffs were entitled to no more than $10,000.00 in aggregate damages was rejected.  (ECF No. 242 at 77).  Defendants had argued that Plaintiffs were estopped from seeking more than $10,000.00 based on Mr. Springer's testimony at a claim estimation hearing in Imperial's main bankruptcy case.  (ECF No. 242 at 74). At that hearing, Mr. Springer testified that the aggregate value of Imperial's tangible assets was no more than $10,000.00.  (ECF No. 242 at 74).  However, Mr. Springer's testimony was found to have no binding effect on Plaintiffs.  (ECF No. 242 at 77).

Defendants argue that the damage award was based on a "manifest error of fact—that the Brazil Unit was an MST 1000."  (ECF No. 282 at 15).  According to Defendants, this manifest error undermines Mr. Cole's conclusion that the cost of the Chad Unit was comparable to the cost of Imperial's MST 1000 unit.  (ECF No. 282 at 15).  Defendants also argue that the cost of the

Chad Unit "bears no rational relation to the cost, condition, use or marketability" of Plaintiffs'
property.  (ECF No. 282 at 16).  Because Mr. Cole used a faulty analog to estimate the damages
Plaintiffs suffered, Defendants conclude that Plaintiffs failed to prove their damages with
reasonable certainty.  (ECF No. 282 at 17).

### *Defendants' Rule 59 Motion on Remand*

After its remand, this Court set Defendants' motion for a hearing.  The parties exchanged
voluminous reply briefs, as well as briefs on various evidentiary matters.  After concluding the
five-day evidentiary hearing, the Court took the matter under advisement.

## JURISDICTION

This Court's jurisdiction over this adversary proceeding originated in the District Court,
which had jurisdiction under 28 U.S.C. § 1334.  Under 28 U.S.C. § 157(a), this proceeding was
referred to the Bankruptcy Court by General Order 2012-6.  This is a core proceeding under 28
U.S.C. § 157(b)(2)(A), (E), (G), and (O).  On appeal, jurisdiction vested in the District Court.  28
U.S.C. § 158(a)(1) (2020).  The District Court then remanded the case to this Court under
Bankruptcy Rule 8008(c), with directions to consider the Rule 59 Motion on its merits.  FED R.
BANKR. P. 8008(c).

## DISCUSSION

Defendants seek relief under Federal Rule of Civil Procedure 59.  Under Rule 59, the Court
may "open the judgment if one has been entered, take additional testimony, amend findings of fact
and conclusions of law . . . and direct entry of a new judgment."  FED. R. CIV. P. 59(a)(2).[4]  In
considering a Rule 59 motion, "the need to bring litigation to an end and the need to render
decisions on the basis of all facts" must be balanced.  *Ford v. Elsbury*, 32 F.3d 931, 937 (5th Cir.

---

[4] Bankruptcy Rule 9023 makes Rule 59 applicable to adversary proceedings.  FED. R. BANKR. P. 9023.
However, Bankruptcy Rule 9023 requires motions for relief be filed within 14 days after entry of the judgment.  *Id.*

1994) (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 174 (5th Cir.1990)) (internal quotation marks omitted). Rule 59(e) allows courts to alter, amend, or vacate previously entered judgments. FED. R. CIV. P. 59(e).

Rule 59(e) enables the Court to "correct manifest errors of law or fact" and enables parties to "present newly discovered evidence." *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002) (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir.1989)) (internal quotation marks omitted). Courts have considerable discretion in deciding Rule 59(e) motions. *Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350, 355 (5th Cir. 1993).

A manifest error of fact is an error plainly and indisputably contrary to the evidentiary record. *Bender Square Partners v. Factory Mut. Ins. Co.*, 4:10-CV-4295, 2012 WL 1952265, at *3 (S.D. Tex. May 30, 2012) (quoting *In re Wahlin*, 10-20479-TLM, 2011 WL 1063196, at *2 (Bankr. D. Idaho Mar. 21, 2011)); *see also Tagore v. United States*, CV H-09-0027, 2012 WL 12877829, at *2 (S.D. Tex. Feb. 2, 2012) (quoting *Bank One, Texas, N.A. v. F.D.I.C.*, 16 F. Supp. 2d 698, 713 (N.D. Tex. 1998)) (A manifest error of fact "'is an obvious mistake or departure from the truth.'"). Newly presented evidence will be considered only if it is probative on an issue sought to be reconsidered. *See Luig v. N. Bay Enterprises, Inc.*, 817 F.3d 901, 906 (5th Cir. 2016) (explaining that a dismissal should have been reconsidered because the Rule 59(e) movant's newly presented evidence was probative on the basis for dismissal). The party offering newly discovered evidence need not demonstrate that it exercised diligence in obtaining that evidence. *Ford*, 32 F.3d at 937 (5th Cir. 1994) (quoting *Lavespere,* 910 F.2d 167, 174 (5th Cir.1990)) ("[I]n order to reopen a case under Rule 59(e) on the basis of [new] evidentiary materials . . . the mover need not first show that her default was the result of mistake, inadvertence, surprise, or excusable neglect . . . ." (internal quotation marks omitted)). Nevertheless, a Rule 59 motion based on newly presented

evidence will be denied if the failure to present such evidence pre-judgment was "unexcused." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (citing *Russ v. Int'l Paper Co.*, 943 F.2d 589, 593 (5th Cir.1991)).

Defendants contend the Judgment must be amended because it is based on manifest errors of fact that are highlighted by newly discovered evidence. Based on the record, the Judgment was based, in part, on manifest errors of fact. Specifically, the errors included findings that (1) Imperial possessed two functional, refurbished MST 1000 units at the time of the Trustee's assignment, (2) that Defendants failed to return an operational, refurbished MST 1000 unit to Plaintiffs, (3) that Defendants failed to return certain MST component parts, and (4) that Mr. Cole's damages estimates represented the actual damages caused by Defendants' stay violations. These errors warrant the Judgment's amendment.

## I.   ERRONEOUS FACTUAL FINDINGS REGARDING THE MST UNITS

There is no evidence establishing the existence of two operational MST 1000 units during Imperial's bankruptcy. Rather, prior to bankruptcy, Imperial owned one demonstration MST 1000 unit (the "Demo Unit") and one MST 150 unit. The MST 150 unit was located in Brazil from 2010 to May 2012. After its return to the United States, the Brazil Unit was "parted out and used to reconfigure" the Demo Unit. (ECF No. 669-5 at 43:3–6). When the Trustee assigned Imperial's tangible property to Plaintiffs, Defendants were in possession of the Demo Unit, the remaining *components* of the Brazil Unit, and various other MST component parts—not two fully operational and refurbished MST 1000 units. Prior to entry of the Judgement, Defendants returned the Demo Unit and the remaining MST component parts to Plaintiffs. Because the Judgment was based on Defendants' alleged retention of two operational, refurbished MST 1000 units that did not exist,

Defendants are entitled to relief from the Judgment.  FED. R. CIV. P. 59(e); *Transtexas Gas*, 303 F.3d at 581.

### A.      Imperial Possessed One Functional MST Unit

At the time of the Trustee's assignment, Imperial did not possess two operational MST 1000 units.  The Judgment was based on findings that: (1) the Trustee assigned to Plaintiffs "all rights with respect to the Debtor's equipment, including the *two MST 1000 units that the Debtor delivered to Basic* . . . pursuant to the MOU;" and (2) "Defendants failed to deliver *all of the equipment in [Defendants'] possession*. . . . [including] the other MST 1000 unit" to Plaintiffs. (ECF No. 242 at 21 (emphasis added)).  Based in part on these findings, Defendants were held liable for willfully violating the automatic stay.  These findings are unsupported by the evidence.

These erroneous findings arise from the premise that the MOU was consummated. Specifically, that Imperial had delivered one MST 1000 unit to Basic prior to the execution of the MOU and that Imperial delivered a second MST 1000 unit to Basic in 2012.  (ECF No. 242 at 15–16).  It was found that Defendants cannibalized this first unit and kept the second unit.  (ECF No. 242 at 64–65).  Implicit in this conclusion is that, by the time of the assignment, Defendants had completed the refurbishment of two MST 1000 units, as contemplated by the MOU.

One of these units was refurbished by Basic in September 2012.  (ECF No. 242 at 16). Ryan Boulware, Imperial's only employee, confirmed this refurbishment in November 2013.  (*See* ECF No. 669-5 at 25:18–26:8; 42:22–43:3).[5]  Prior to its refurbishment, this unit had been stored

---

[5] Ryan Boulware, Imperial's employee, testified regarding the fate of the Brazil Unit at a Rule 2004 examination in November 2013.  (ECF No. 669-5 at 1).  Mr. Boulware did not testify at trial.  (ECF No. 242 at 34–54).  His testimony from the 2004 examination is new evidence not previously considered by this Court.  This testimony is probative on an issue decided by the Judgment.  *See Luig*, 817 F.3d at 906.  The transcript of Mr. Boulware's testimony was admitted during the Rule 59 hearing under Federal Rule of Evidence 807.  (ECF No. 684 at 139:10–140:5).

at Imperial's facility[6] for "approximately five or six years." (ECF No. 143 at 29:2–10). This unit was an MST 1000 and had "a skid, . . . some pumps and motors, . . . an applicator, a waveguide, . . . control panel . . . . and a microwave transmitter." (ECF No. 143 at 29:11–20). Basic took delivery of this unit sometime before the MOU was executed in September 2011. (ECF No. 220 at 16:25–19–2).

The second unit Basic was to refurbish under the MOU was the Brazil Unit. (ECF No. 143 at 29:24–30:3). This unit arrived at Basic equipment in May 2012. (ECF No. 618 at 41:9–42:8). The Brazil Unit was not originally built as an MST 1000 unit. (*See, e.g.,* ECF Nos. 143 at 30:1–3, 15–16; 618 at 41:23–42:1). Rather, it was an "MST 150" that was eventually upgraded with an "MST-1000 applicator." (ECF No. 144 at 146:2–8).[7] The Brazil Unit was not refurbished when it was returned to the United States. Instead, it was "parted out and used to reconfigure the MST 1000." (ECF No. 669-5 at 43:3–6). After being shipped back to the United States, the Brazil Unit was never operational. (ECF No. 144 at 83:8–12).[8]

Contrary to the finding that Imperial owned two functional MST 1000 Units as of the assignment, the Demo Unit was the only complete MST unit owned by Imperial after the Brazil Unit was parted out. (Case No. 13-30466, ECF No. 278 at 53:18–55:5;[9] Case No. 14-03375, ECF No. 669-5 at 25:18–26:3). Hence, the MOU was never fully consummated.

---

[6] The parties frequently refer to this facility as the "Dayton" facility. (*See e.g.,* ECF No. 143 at 29:4–10).

[7] The applicator is the MST Unit component in which the microwaves are applied to fluid to cause oil separation. (ECF No. 669-5 at 44:21–24). The MST 1000 applicator used to upgrade the Brazil Unit was an applicator Imperial had stored that was refurbished in Houston and then sent to Brazil. (ECF No. 143 at 19:3–23).

[8]      Q      But [the Brazil Unit] had to be disassembled for purposes of shipping, correct?
         A      Correct.
(ECF No. 144 at 83:5–7 (Testimony of Alan Springer)).

[9] Any statements Mr. Springer made in his capacity as Imperial's CEO are admissible. (ECF No. 618 at 66:20–67:6, 67:18–21, 71:19–20); *see also* Fed. R. Civ. P. 59(a)(2); *In re Galaz*, 841 F.3d 316, 325–27 (5th Cir. 2016).

Rejecting the premise that the MOU was fully consummated leads to the conclusion that Defendants did not keep "a refurbished, functional, operational safe MST 1000 Unit."  (ECF No. 688 at 42).  Contrary to the finding supporting the Judgment, Defendants did not keep a functioning Brazil Unit.  In fact, the Brazil Unit was never operational after it returned from Brazil.  (ECF Nos. 144 at 83:24–84:11, 146:22–23; 178:7–19; 669-5 at 25:18–26:8, 43:3–6).[10]  Rather, the Brazil Unit was "parted out and used to reconfigure" the Demo Unit.  (ECF No. 669-5 at 43:3–6).

Also unsupported by the evidence is Plaintiffs' contention that Defendants kept "a refurbished, functional operational, safe MST1000 Unit depicted on Page 3 of Plaintiffs Exhibit 127."  (*See* ECF No. 688 at 42).  First, Plaintiffs' Exhibit 127 does not depict the Brazil Unit—the unit Defendants were previously found to have retained.  (ECF No. 684 at 26:15–25, 28:9–13).  Instead, it depicts the Demo Unit.  (ECF No. 684 at 26:15–25, 28:9–13).  Second, Defendants returned the unit depicted in Plaintiffs' Exhibit 127—the Demo Unit—but it was disassembled.  (ECF No. 684 at 106:3–17).  The evidence shows that Plaintiffs only had one MST 1000 unit to be returned, and that is was returned, albeit partially disassembled.  The prior finding is "indisputably contrary to the evidentiary record."  *Bender Square*, 2012 WL 1952265, at *3.

### B.   Imperial's Property Returned

The Judgment is partially based on Defendants' failure to turnover MST components to Plaintiffs.  The components found to be missing were a microwave transmitter, an x-shaped waveguide, a centrifuge stand, and two applicators.  (ECF No. 242 at 21, 65).  Plaintiffs maintain that Defendants never turned over an MST 1000 unit, an x-shaped waveguide, and two applicators.  (ECF No. 688 at 42, 48–49).  The evidence establishes that Plaintiffs' property was returned.

---

[10] Mr. Boulware noted that Imperial determined the Brazil Unit was not be suitable "future operations."  (ECF No.  669-5 at 65:8–16).

Defendants did not fail to return an x-shaped waveguide.  At one point, Basic did fabricate an x-shaped waveguide for Imperial.  (ECF No. 670 at 48:22–49:4).  However, Basic manufactured this single waveguide for the Chad Unit, which was not property of the estate.[11]  (ECF No. 670 at 46:18–49:12).  Mr. Balke credibly testified that neither the Demo Unit, nor the Brazil unit, was equipped with an x-shaped waveguide.  (ECF No. 670 at 48:7–15, 49:10–12).  Based on Mr. Balke's testimony, Defendants were not in possession of an x-shaped waveguide that belonged to Plaintiffs.[12]  There is no credible evidence to the contrary.

Plaintiffs' applicators were also returned by Defendants.   Plaintiffs maintain that Defendants never returned two of Plaintiffs' MST 1000 applicators—the Brazil Unit applicator and an applicator manufactured by Basic.  (ECF Nos. 688 at 48–49; *see also* ECF No. 134 at 53:8–24).  The finding that Defendants kept two of Plaintiffs' applicators was based Mr. Emmott's

---

[11] Mr. Springer confirmed that the Chad Unit was not Imperial's property during the course of Imperial's bankruptcy.  Specifically, Mr. Springer testified:

> BY MS. CAMPBELL: Q    So once one of the units went to Chad, it was no longer one of IPRC's MSTs?
> A        The note was sold.
> Q        Right. So it wasn't IPRC's?
> A        Correct.
> Q        It was gone? we are just looking at the two units then, the MST150 and the MST1000 that was not functioning until -- I believe your testimony was August of 2012?
> A        Yes.

(Case No. 13-30466, ECF No. 278 at 55:12–20).

[12] The only contrary evidence offered was the testimony of Gary Emmott, one of the plaintiffs.  Mr. Emmott testified that an x-shaped waveguide was not returned to Plaintiffs.  (ECF No. 134 at 53:5–12).  Mr. Emmott based this statement on observations he made at Basic's facility two weeks before Defendants began returning Plaintiffs' equipment.  Specifically, Mr. Emmott testified: "[o]n the -- August the 1st, when I was walking through the paint barn and I saw [the x-shaped waveguide] then. But when we went back out there on the 13th it was not there anymore." (ECF No. 134 at 54:2–4).  However, Mr. Emmott only concluded that he saw an x-shaped waveguide at Basic's facility based on a photo depicting the Demo Unit's waveguide.  (*See* ECF No. 134 at 53:25–54:7; *see also* ECF No. 492-4 at 1 (Plaintiffs' Exhibit 18)).  The photo on which Mr. Emmott relied does not depict an x-shaped waveguide.  (*Compare* ECF No. 492-4 at 1 *with* ECF No. 601-474).  Moreover, a day after Plaintiffs took delivery of the property stored at Basic (and two days after Mr. Emmott said he saw the x-shaped waveguide), Mr. Emmott sent Mr. Balke a list of the items Defendants purportedly failed to deliver.  (*See* ECF No. 623-62 at 6).  An x-shaped waveguide is not among the parts listed.  Defendants did, however, return a waveguide to Plaintiffs roughly two weeks after Defendants began returning Plaintiffs' property.  (ECF No. 670 at 104:2–17; *see also* ECF No. 623-24 at 4).

testimony.  (ECF No. 242 at 21).  Mr. Emmott testified that he knew Basic had the applicators because:

> Well, the two applicators -- the way we determine that is there's one applicator for the -- the MST-1000, it was on the Daymar (phonetic) unit. There was one on the trailer. Then they upgraded the one on the Brazil unit that came back to a MST-1000. And then he was building two MST-1000 Applicators in Exhibits 26 and 97 projects.
>
> So we only got back two Applicators, and so we want the one that was on the Brazil unit and the one that he was building, even though it shows that he's got two there, so.

(ECF No. 134 at 53:16–24).  The applicator referenced in Exhibit 26 was not a newly manufactured applicator.  Instead, it was an existing applicator taken from Imperial's equipment.  (ECF No. 108 at 17:15–17, 20:3–25; *see also* ECF No. 336-3).  With respect to the applicator referenced in Exhibit 97, Plaintiffs failed to establish that this applicator was ever produced by Basic for Imperial.  (ECF No. 108 at 31:24–32:17).[13]

At trial, Mr. Balke testified that Imperial delivered one applicator with the shipment of equipment sent to Basic prior to the execution of the MOU.  (ECF No. 220 at 17:19–25).  Later, a second applicator arrived at Basic in the container that came back from Brazil.  (ECF No. 108 at 11:24–12:3).  According to Mr. Balke, Mr. Springer allegedly gifted Basic the contents of this container, which included an applicator.  (ECF No. 108 at 14:14–21).  This applicator from the container was installed on a skid in Basic's shop (this is the same applicator referenced in Exhibit 26).  (ECF No. 109 at 36:14–22).  Based on Mr. Balke's testimony, only two applicators were ever sent to Defendants.  Mr. Emmott confirmed Plaintiffs' receipt of two applicators.  (ECF No. ECF No. 134 at 53:22–24).  Nothing in the record establishes Defendants' ever possessed more than

---

[13] Mr. Balke did testify that Basic manufactured an applicator for Ultratec.  (ECF No. 108 at 32:3–6). However, nothing in the record establishes that Imperial held a property right in this applicator.

two of Plaintiffs' applicators, and nothing in the record proves Defendants retained possession of any of Plaintiffs' applicators.

The Judgment includes findings that Defendants failed to turnover a centrifuge stand and a microwave transmitter (or generator).  (ECF No. 242 at 21, 65).  The finding that Defendants failed to turnover a transmitter was based on the testimony of Mr. Emmott.  (ECF No.  242 at 21). Specifically, Mr. Emmott asserted that one of two Ferrite microwave transmitters was not retuned to Plaintiffs.  (ECF No. 134 at 143:10–16).  The only evidence supporting Mr. Emmott's allegation that Plaintiffs owned two Ferrite transmitters, one of which was not returned, is Mr. Emmott's own allegation.[14]  Mr. Balke testified that Defendants were in possession of three transmitters belonging to Plaintiffs: an AMTEK transmitter, a Ferrite transmitter, and one other brand of transmitter. (ECF No. 670 at 65:12–18; *see also* 12/15/2020 Hearing Recording at 3:32:10 PM).  Timothy Cole, Plaintiffs' damages expert, relied on the fact that all three of these transmitters were in Plaintiffs' possession after the assignment.  (ECF No. 175 at 41:16–23).  Mr. Balke's uncontested testimony establishes that Defendants returned all of Plaintiffs' transmitters.

Finally, Defendants assert that it was error to find that they failed to return Plaintiffs' centrifuge stand.  Mr. Balke noted that Exhibit 127 depicts a centrifuge placed on a stand on the Demo Unit skid.  (ECF No. 684 at 65:13–18; *see also* ECF No. 623-21 at 3 (Exhibit 127)).  The stand on which the centrifuge sat was purchased at Office Depot according to Mr. Balke.  (ECF No. 684 at 65:15–18).  During the Rule 59 hearing, no evidence was offered to dispute the finding

---

[14] Mr. Emmott was a credible witness as to things that were actually within his personal knowledge. However, the Court concludes that much of his testimony was based on his own speculation or on inadmissible hearsay.  His involvement with Imperial and its products was, admittedly, hands off.  (ECF No. 134 at 149:7–150:25). Between "early 2012" and August 2014, Mr. Emmott did not visit Defendants' facility, nor examine Imperial's equipment housed at Defendants' facility.  (ECF No. 684 at 112:1–24).  In fact, Mr. Emmott had never personally witnessed one of Imperial's MST units in operation.  (ECF No. 134 at 144:10–145:1).  Due to Mr. Emmott's arms-length familiarity with Imperial's equipment, his unsupported allegation that Plaintiffs are missing a Ferrite transmitter carries little weight.

that Defendants failed to return this stand.  Without contrary evidence, the finding is not manifestly erroneous.

The finding that Defendants failed to return an x-shaped waveguide, two applicators, and a microwave transmitter was erroneous.  *See Transtexas Gas*, 303 F.3d at 581.  Defendants' failed to establish that the finding regarding the missing centrifuge stand was erroneous.

## II.   ERRONEOUS FINDINGS REGARDING THE PLAINTIFFS' DAMAGES

Plaintiffs' damages award was based on the erroneous conclusion that Mr. Cole's damages estimate represented the actual damages to which Plaintiffs were entitled.  First, Mr. Cole provided a damage estimate equivalent to the cost building a new MST 1000 unit to replace the unit Defendants retained.  (ECF No. 242 at 73).  However, Plaintiffs were not entitled to the cost of building a new MST 1000 unit because Plaintiffs only owned one MST 1000 unit, which was returned.  The unit was over 10 years old.  It was primarily comprised of electronics equipment. Any estimate for building a new unit was inherently flawed.  Second, Mr. Cole provided an estimate for the refurbishment of the "cannibalized" MST 1000 unit.  (ECF No. 242 at 71).  This estimate exceeds the measure of damages to which Plaintiffs are entitled because, while a disassembled MST 1000 unit was returned, Plaintiffs possessed all the components necessary to reassemble the unit.  Since Plaintiffs could have reassembled the unit, the proper measure of damages would be the cost of reassembly.  At most, Plaintiffs are entitled to the reasonable cost of reassembly of the returned MST 1000 unit, not the cost of renovating it.

### A.   Damages for the "Missing" MST 1000 Unit

There is no evidentiary basis to award damages for the loss of an MST 1000 unit.  The record is clear that at the time of the assignment, Imperial only had one functioning MST 1000 unit—the Demo Unit.  In other words, the estate's property did not include a second functional

MST 1000 unit.[15] The Demo Unit was returned to Plaintiffs, along with all of the Plaintiffs' valuable property that was in Defendants' possession.  The automatic stay only protects property of the estate.  *In re Le*, 07-34244, 2007 WL 4197515, at *2 (Bankr. S.D. Tex. Nov. 21, 2007)[16].  Without proof that some interference with estate property occurred, there cannot be an automatic stay violation.  *See Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 355 (5th Cir. 2008); (citing *In re Repine,* 536 F.3d 512, 519 (5th Cir.2008)) (requiring proof of a stay violation as a prerequisite to an award of damages under 11 U.S.C. § 362(k)).  There is no proof in the record that the estate owned a second, unreturned MST 1000 unit.  Plaintiffs are not entitled to damages for interference with non-existent property.  *Cf. Repine,* 536 F.3d at 519.

### B.    Damages for the "Cannibalized" MST 1000 Unit

Plaintiffs may be able to recover the reasonable cost of the Demo Unit's reassembly. Willful violations of the automatic stay (or of the sale order) may warrant an award of damages. 11 U.S.C. § 362(k).  Generally, damages for willful stay violations are limited to actual damages. *In re Collier*, 410 B.R. 464, 476 (Bankr. E.D. Tex. 2009) (citing *In re All Trac Transp., Inc.*, 223

---

[15] At trial, Mr. Balke explained why a second functional MST 1000 unit was never completed:

> We initially relied on Mr. Springer's impression and his recant of -- or his count of all his equipment to be two units.  He told us he had enough equipment to build two and he wanted one to be a demo, but once the demo unit had been put together and it had so many material flaws and age that we couldn't keep it running with Mr. Ryan Boulware's instruction, became very obvious he didn't have enough components that were reliable or useful to build a unit number two out of the bits and pieces he had there for us.

(ECF No. 227 at 82:24–83:9).  Mr. Balke's trial testimony is buttressed by Mr. Boulware's consistent testimony that, as of November 2013 (more than 10 months post-petition), Imperial only had one functional MST unit.  (*See* ECF No. 669-5 at 42:22–43:6).

[16] The estate's property was sold to Plaintiffs on July 15, 2014.  No party has argued that there was any error in the original findings and conclusions that the automatic stay continued to apply after the transfer of the property. Although the Court has substantial doubts about this issue, it likely has little to do with the outcome.  In part, this proceeding actually vindicates alleged violations of the sale order, rather than violations of the stay itself.  That is, before July 15, 2014, Defendants would have violated the stay by interfering with Plaintiffs' property.  Any interference on July 15, 2014 or after would actually be a violation of the sale order.

Fed. Appx. 299, 302 (5th Cir. 2006)). An award of actual damages must be supported by "a sufficient factual foundation." *Id.* (quoting *In re Sucre*, 226 B.R. 340, 349 (Bankr. S.D.N.Y.1998)) (internal quotation marks omitted). A "sufficient factual foundation" is one that ties the stay "violation to identifiable losses." *All Trac Transp.*, 223 Fed. Appx. at 302. Essentially, Plaintiffs had to establish that (1) Defendants willfully violated the stay, and (2) the amount of damages that directly resulted from Defendants' violation.

Defendants were found to have acted willfully in violation of the automatic stay by deliberately dismembering the Demo Unit. (ECF No. 242 at 64–66). The Judgment's damages award for this violation lacks a sufficient factual foundation.

### 1.   Finding that Defendants' Willfully Violated the Stay

The finding that Defendants dismantled the Demo Unit was based on testimony that some of Imperial's MST components were being used by Basic to build its own MST unit. (*See* ECF No. 242 at 23; *see also* ECF Nos. 104 at 35:23–36:11; 108 at 9:17–10:8; 185 at 11:20–22, 12:16–16:15; 151 at 208:7–18). Mr. Emmott testified that the Demo Unit came back "totally stripped, gutted and non-functional and missing all kinds of parts." (ECF No. 56:21–24). Plaintiffs' exhibits establish that between July 2013 and August 2014 (when Plaintiffs' property was returned) parts were occasionally removed and then reinstalled on the Demo Unit. (*Compare* ECF Nos. 623-21 at 1, 3 *with* ECF Nos. 623-23 at 1 *and* 625-12 at 2; *see also* ECF No. 670 at 37:6–16; 128 at 41:3–42:14, 48:8–50:25). Based on this evidence, Defendants were found to have dismantled the Demo Unit.

Mr. Balke conceded that Basic removed the chiller from the Demo Unit. (ECF No. 105 at 5:19–6:9).[17] This chiller, as well as a waveguide and microwave transmitter (which were not from

---

[17] Specifically, Mr. Balke testified that he removed the chiller depicted in Exhibit 127, which is a photo of the Demo Unit. (*See* ECF No. 684 at 26:15–25, 28:9–13; *see also* ECF Nos. 623-21 at 3, 227 at 10:21–11:5; 625-16).

the Demo Unit) were placed on a skid in Basic's shop[18] between May 2014 and July 2014.  (ECF
No. 105 at 12:18–13:10, 14:7–12).[19]  The microwave transmitter, as well as an applicator Basic
used for its skid, were taken from the Brazil Unit.  (ECF No. 227 at 9:7–16).  Mr. Balke contends
Basic used these parts because Mr. Springer had given them to Basic in lieu of paying storage fees
charged by Basic.  (ECF No. 227 at 7:13–16).[20]  That is, Mr. Balke believed the chiller, waveguide,
applicator, and transmitter were Basic's property.  Of these components, only the chiller's origin
can be traced to the Demo Unit.

Missing from the record is any *direct* evidence establishing that Defendants, wrongfully or
without Imperial's consent, dismantled the Demo Unit.  Plaintiffs argue that Imperial could not
have instructed Basic to dismantle the Demo Unit because Basic's own records indicate that none
of Imperial's employees or directors were at Basic's facility between July 2013 and August 2014.
(*See* ECF No. 688 at 33–34).  Yet no work order, no invoice, no email, no phone conversation,
and no direct testimony was offered establishing that Defendants wrongfully dismantled the Demo
Unit.

There are, however, communications that Mr. Springer and Mr. Boulware sent to Basic in
January 2014 indicating that the Demo Unit would need to be prepared for a demonstration.  (ECF
Nos. 623-69; 625-20).  As evidenced by these communications, it is entirely possible that Imperial
could have directed Basic to disassemble or reconfigure the Demo Unit without setting foot on

---

[18] This skid was Basic's "mock-up" skid.  (ECF No. 227 at 9:21–10:4).

[19] Plaintiffs contend that Eugene Eddy, a Basic employee, confirmed that Mr. Balke, not Imperial, directed
Basic employees to remove components from the Demo Unit.  (*See* ECF No. 688 at 12).  This contention misrepresents
Mr. Eddy's testimony by presenting the testimony out of context.  (*See* ECF No. 151 at 209:19–25, 210:15–212:19).

[20] Mr. Balke's Rule 59 testimony was consistent with his trial testimony that Basic took only the chiller from
the Demo Unit.  (*See* ECF No. 670 at 64:14–73:7).

Basic's property.  However, there is no *direct* evidence proving Basic disassembled the Demo Unit at Imperial's direction.

Nevertheless, it was previously found that Defendants willfully violated the stay by disassembling the Demo Unit.  This finding resolved a factual dispute through reliance on circumstantial evidence.  Based on the record, vacating this finding would require that evidence to be rehashed.  Rule 59 does not afford such an opportunity.  *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir.1990)) ("[A Rule 59] motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment.").  The Court will not reconsider this finding.

### 2.    Damages Based on Defendants' Willful Violation

Although the Court leaves the "dismantling" finding intact, the damages award for the dismantling was erroneous.  Specifically, there was not a sufficient factual basis linking the Demo Unit's disassembly to an award of damages based on the cost of refurbishing the MST 1000 unit. Instead, the appropriate measure of damages is the reasonable cost of the Demo Unit's reassembly.

The prior damages award stems from the erroneous conclusion that Defendants' willful actions deprived Plaintiffs of the benefit of their bargain with the Trustee.  (ECF No. 242 at 70). That is, that Plaintiffs did not end up with a newly refurbished, operational MST 1000 Unit. Unfortunately for Plaintiffs, the evidentiary record offers no support for the finding that the Demo Unit was refurbished with new parts prior to its assignment.

Mr. Boulware testified that the last time he had seen the Demo Unit operating was in June 2013.  (ECF No. 669-5 at 42:2–6).  At that point, Demo Unit was made up of parts from the Brazil Unit and other parts supplied by Imperial that were 12 to 14 years old.  (ECF Nos. 669-5 at 43:3–

6; 144 at 88:6–15).  From its "refurbishment" in 2012 to its last documented operation in June 2013, the Demo Unit needed multiple repairs.  (ECF No. 670 at 19:16–20:15).  While Defendants were found to have "cannibalized" the Demo Unit between June 2013 and August 2014, there is no evidence suggesting that the Demo Unit's condition improved during that period.  Nor is there evidence that the Demo Unit's components were replaced with new ones.  So, when the Trustee assigned the Demo Unit to Plaintiffs on July 15, 2014, Plaintiffs became owners of the Demo Unit as it existed before the "cannibalization" took place.  This is the benefit Plaintiffs were entitled to from their bargain with the Trustee—ownership of an un-cannibalized MST 1000 unit built from a mishmash of old and used components.

Plaintiffs are only entitled to restoration of the Demo Unit *as it existed prior to Defendants' interference*.  Plaintiffs' cannot recover the costs of repairing and replacing the Demo Unit. (*Contra* ECF No. 242 at 70 (citing *J & D Towing, LLC v. American Alternative Ins. Corp.*, 478 S.W.3d 649, 656 (Tex. 2016))).  Instead, Defendants must ensure Plaintiffs are returned to the *status quo* by "undoing [their] previous action." *Commercial Credit Corp. v. Reed*, 154 B.R. 471, 476 (E.D. Tex. 1993) (citing *In re Wariner*, 16 B.R. 216, 218 (Bankr. N.D. Tex. 1981)); *see also In re Freemyer Indus. Pressure, Inc.*, 281 B.R. 262, 267 (Bankr. N.D. Tex. 2002) (finding that a creditor was required to return the debtor to its pre-stay violation position).  Here, that means Defendants must un-cannibalize the Demo Unit by reassembling it—an action Mr. Balke already offered to undertake free of charge.  (*See* ECF No. 670 at 60:20–61:1).

Of course, Plaintiffs were free to decline Mr. Balke's offer, which the they did, thereby preventing Defendants from restoring the *status quo*.  (ECF No. 459 at 80:17–25).  However, Plaintiffs were not then entitled to the cost of refurbishing the Demo Unit to like-new condition. Rather, Plaintiffs were then entitled to the reasonable cost of having a third-party reassemble the

unit.  *See Com. Credit*, 154 B.R. at 476 ("An entity's failure to comply with its duty to restore the status quo and undo its previous actions which violated the stay may constitute a willful violation of the stay."); *Collier*, 410 B.R. at 476 (requiring that actual damages for a willful stay violation be proven with reasonable certainty and based on a sufficient factual foundation).

The prior replacement-value award lacked a sufficient factual foundation because it did not tie Defendants' stay violation to Plaintiffs' identifiable losses.  *See All Trac Transp.*, 223 Fed. Appx. at 302.   Instead, the prior award was based on an estimate that assumed Plaintiffs were entitled to the cost of repairing the Demo Unit with new replacement parts.  (*See* ECF No. 620-29 at 4–5).  However, the Demo Unit did not consist of new parts when it was assigned.  In reality, the Demo Unit consisted of old and used parts.  Based on the evidence, the identifiable loss Plaintiffs suffered at Defendants' hands was the disassembly of the Demo Unit.  *See All Trac Transp.*, 223 Fed. Appx. at 302.  That is the loss for which Plaintiffs must be compensated.[21]

Finally, because the finding that Defendants failed to turnover Plaintiffs' centrifuge stand is left undisturbed, Defendants were still required to turn this stand over to Plaintiffs upon entry of the Judgment.   Plaintiffs did not argue that the stand had not been returned after entry of the Judgment.  Plaintiffs are not entitled to damages under § 362(k).  *See City of Chicago, Ill. v. Fulton*, 141 S. Ct. 585, 590–92 (2021) (holding that the passive retention of estate property, absent a turnover order or demand, does not violate the automatic stay).

It was Plaintiffs' burden to prove damages.  Plaintiffs introduced no evidence regarding the cost of reassembly of the MST unit.  Mr. Balke offered to reassemble the unit, without charge.  Mr. Balke also testified that reassembly would take "[t]wo men to [one] day would be between eight and 10 hours."  (ECF No. 670 at 60:17–18).  This is the only evidence of the cost of

---

[21] However, neither party presented evidence demonstrating what it would cost to reassemble the Demo Unit.

reassembly.  The Court concludes that Mr. Balke offered to reassemble the unit for free for the purpose of concluding the dispute.  Plaintiffs are awarded $4,000 for the cost of reassembly.

## CONCLUSION

Defendants are entitled to partial relief from the Judgment.  This relief is based on the manifestly erroneous findings supporting the Judgment.  Because the damages award was based on these manifestly erroneous findings, that award must be reduced to $4,000.00.

Having resolved Defendants' Rule 59 Motion, this Court awaits further instruction from the District Court.

SIGNED 03/11/2021

Marvin Isgur
United States Bankruptcy Judge